Filed 1/20/15  Downtown Sunnyvale Residential v. Wells Fargo Bank CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DOWNTOWN SUNNYVALE RESIDENTIAL LLC et al., <br><br> Cross-complainants and Appellants, <br><br> v. <br><br> WELLS FARGO BANK, N.A., as Successor in Interest, etc., <br><br> Cross-defendant and Appellant; <br><br> L. GERALD HUNT, as Receiver, etc., <br><br> Respondent. | H038572 <br> (Santa Clara County <br> Super. Ct. No. 109-CV153447) |
| DOWNTOWN SUNNYVALE RESIDENTIAL LLC et al., <br><br> Cross-complainants, <br><br> v. <br><br> WELLS FARGO BANK, N.A., as Successor in Interest, etc., <br><br> Cross-defendant and Appellant; <br><br> L. GERALD HUNT, as Receiver, etc., <br><br> Movant and Respondent. | H039024 <br> (Santa Clara County <br> Super. Ct. No. 109-CV153447) |

Downtown Sunnyvale Mixed Use, LLC (DSMU) was the owner and developer of the Sunnyvale Town Center (Project), a mixed-use development set to encompass eight blocks of residential, retail and commercial space in Sunnyvale, California.[1] Construction on the Project began in 2007, and DSMU invested $350 million, with $108.8 million financed by a construction loan provided by Wells Fargo.[2] Two years later, the borrowers defaulted. The Project was incomplete and portions of the site became vulnerable to weather damage, vandalism, and erosion.

Subsequently, Wells Fargo began judicial foreclosure proceedings and sought appointment of a receiver as provided for in the deed of trust securing its loan. The appointed receiver, L. Gerald Hunt, spent approximately $85 million on the Project, the bulk of which Downtown Sunnyvale alleges was improperly used on development. In 2011, Wells Fargo purchased the property at a nonjudicial foreclosure sale and Hunt moved for discharge. Overruling objections made by Downtown Sunnyvale, the trial court discharged Hunt and ordered Wells Fargo to pay the costs of the receivership through the date of discharge. Separately, the court ordered Wells Fargo to pay Hunt's

---

[1] Downtown Sunnyvale Residential, LLC, Downtown Sunnyvale Mixed Use, LLC, SHP San Jose, LLC, and Peter Pau have appealed from the trial court's order discharging the court-appointed receiver (case No. H038572). We refer to the parties in their individual capacity when necessary and jointly refer to these appellants as "Downtown Sunnyvale" when discussing their arguments on appeal. Wells Fargo is not a party to Downtown Sunnyvale's appeal in case No. H038572.

Separately, Wells Fargo has appealed from the discharge order and the postdischarge order (case No. H039024), raising arguments solely pertaining to the apportionment of the receiver's fees. Downtown Sunnyvale and Wells Fargo's appeals (case Nos. H038572 & H039024) were ordered considered together for the purposes of record preparation, briefing, oral argument, and disposition.

[2] Wells Fargo Bank, N.A. (Wells Fargo) succeeded Wachovia by merger in the action below. Wachovia is referenced numerous times in the record. For clarity, we will refer to the bank as "Wells Fargo."

postdischarge fees. Downtown Sunnyvale appealed from the discharge order, and Wells Fargo appealed from the discharge order and the postdischarge order.

On appeal, Downtown Sunnyvale argues Hunt impermissibly used his authority as a receiver to develop the Project and breached his duties by failing to remain neutral and neglecting to file monthly reports. Wells Fargo claims the trial court erred in requiring the bank pay all of Hunt's fees.

For the reasons stated below, we conclude the trial court did not err in discharging Hunt, because the court's orders granted Hunt broad authority to manage and improve the Project. We also find the court did not abuse its discretion in ordering Wells Fargo to pay Hunt's predischarge and postdischarge fees notwithstanding the existence of some equitable factors that may have weighed in favor of apportioning fees to the other parties to the litigation. We therefore affirm the orders appealed from in both case Nos. H038572 and H039024.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Project*

   **The Parties**

DSMU, the master developer of the Project, held legal title to approximately 19.71 acres of real property that comprised the Project. In 2007, DSMU was formed as a joint venture between RREEF and SHP San Jose, LLC (SHP).[3] Downtown Sunnyvale Residential, LLC (DSR) is a wholly-owned subsidiary of DSMU. Together, DSMU and DSR secured a $108.8 million loan from Wells Fargo by a deed of trust dated August 27,

---

[3] SHP owns a 5 percent interest in DSMU. RREEF owns the remaining 95 percent interest in DSMU. RREEF is comprised of RREEF America REIT III Corp. MM, a Maryland corporation, and RREEF America REIT III Corp., MM TRS, a Maryland corporation. We collectively refer to these entities as "RREEF."

3

2007.[4] RREEF gave Wells Fargo a written loan guaranty. Pursuant to an agreement with DSMU, Peter Pau acted as the development manager for the project. Hunt was appointed as the receiver for the Project on October 25, 2009, after the Borrowers' default.

**Development and Default**

In 2007, DSMU was formed to develop and acquire the Project, an eight-block mixed-use development consisting of residential, retail, and commercial space in Sunnyvale, California. DSMU invested approximately $350 million and obtained a $108.8 million loan from Wells Fargo. The loan granted Wells Fargo a security interest in the Project's collateral, described in the loan documents as including all buildings, improvements, fixtures, building materials, leases, licenses, occupancy agreements, and contract rights.

The deed of trust securing the loan provided certain remedies to Wells Fargo (as the administrative agent) in the event of default. One remedy allowed Wells Fargo to "apply to any court of competent jurisdiction for the appointment of a receiver for all purposes including, without limitation, to manage and operate the [Project] or any part thereof, and to apply the Rents therefrom as hereinabove provided. In the event of such application, to the extent permitted by applicable law, Trustor [the Borrowers] consents to the appointment of a receiver . . . ." The deed of trust securing the loan provided that a receiver may "make from time to time all alterations, renovations, repairs or replacements to the [Project] as [Wells Fargo] may deem proper."

Wells Fargo issued a notice of default to the Borrowers on August 27, 2009, demanding full payment of the outstanding principal balance ($108.8 million), accrued interest, and incurred costs and expenses. The notice asserted if payment was not rendered, Wells Fargo intended to pursue its available remedies.

---

[4] We collectively refer to DSMU and its subsidiary DSR as "the Borrowers" and refer to each entity in its individual capacity when necessary.

4

On September 25, 2009, Wells Fargo filed a complaint for specific performance, breach of security agreements, and judicial foreclosure.[5] The complaint alleged the Borrowers defaulted by failing to pay the outstanding debt and by failing to remove or release the mechanics' liens filed against the Project. The complaint requested immediate appointment of a receiver pursuant to the deed of trust "with the usual powers and duties of receivers so appointed, to take possession of the [Project] and the [Project's collateral]." Wells Fargo asserted it was entitled to appointment of a receiver under Code of Civil Procedure section 564, subdivision (b)(1), (2), (6) and (9).[6] Wells Fargo also alleged the Borrowers had expressly consented to appointment of a receiver in the deed of trust.

Wells Fargo nominated Hunt to be the receiver. Hunt had experience developing, leasing, and managing shopping centers but did not have experience as a receiver.

Karla Brewer, director of the special situations group with Wells Fargo, submitted a declaration supporting the bank's motion. Brewer said the Project was approximately 40 to 50 percent complete and was in "a perilous condition." Many buildings required

---

[5] Pursuant to California law, "there is only 'one form of action' for the recovery of any debt or the enforcement of any right secured by a mortgage or deed of trust. That action is foreclosure, which may be either judicial or nonjudicial. (Code Civ. Proc., §§ 725a, 726, subd. (a).)" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1236.) Judicial foreclosure can be more expensive and time consuming than nonjudicial foreclosure, because it involves oversight by a court. However, in a judicial foreclosure, "if the property is sold for less than the amount of the outstanding indebtedness, the creditor may seek a deficiency judgment, or the difference between the amount of the indebtedness and the fair market value of the property, as determined by a court, at the time of the sale." (*Ibid*.) In a judicial foreclosure, the debtor also has the statutory right to redemption to regain the property by paying the foreclosure sale price for a period of time after foreclosure. (*Ibid*.) In contrast, a nonjudicial foreclosure (a trustee's sale) can be less costly and more efficient. In a nonjudicial foreclosure, the trustee simply exercises the power of sale given by the deed of trust. (*Ibid*.) However, creditors may not seek a deficiency judgment and the debtor has no postsale right to redemption. (*Ibid*.)

[6] Further unspecified statutory references are to the Code of Civil Procedure.

window, roofing, and caulking work. Other buildings required stuccoing to protect wood frames. Structures that had a combination of wood and metal frames needed weatherization to protect against rust and erosion. There were also significant security risks, because there was only one security guard for the nearly 20-acre Project site. Brewer believed subcontractors would soon begin removing protective equipment from the construction area.

2. *The Receiver's Appointment*

**Wells Fargo's Ex Parte Motion to Appoint a Receiver**

On October 5, 2009, Wells Fargo moved ex parte to appoint a receiver. Wells Fargo had learned the general contractor had terminated its agreement with DSMU and life-safety equipment was being removed from the site. Wells Fargo stated that due to the "imminent risks to the Project and to the general public," a receiver should be appointed to "quickly institute reasonable and appropriate measures to secure the Project and to minimize the safety risks" and to "perform the weatherization and other duties" as well as "any other items [the receiver] deems necessary in his business judgment to protect the Project." Wells Fargo clarified it was willing and prepared to make loan advances to the receiver.

The trial court granted Wells Fargo's ex parte motion and appointed Hunt as the receiver. Hunt was to take immediate possession, custody, and control of the Project and all collateral securing the Borrower's obligations to Wells Fargo under the loan documents and was given "all powers, duties and authorities as are provided by law to take possession of, use, operate, manage and control the Collateral, to collect and receive any and all rents, profits and other income from the Collateral, to protect, preserve, maintain and *improve* the Collateral, and to incur expenses that are necessary and appropriate toward those ends." (Italics added.)

The appointment order broadly granted Hunt powers including but not limited to: (1) the ability to enter and gain access to the Project and to take possession and control of all of the Project's collateral, (2) to operate, manage, and control the Project, (3) to do all things "necessary and appropriate to care for, preserve, protect, secure, and maintain the Collateral, including but not limited to completing weatherization and general protection to any improvements, completing the installation and ensuring the operation of fire sprinklers, ensuring the physical security of the Collateral, ensuring that the Project does not create unreasonable risks to public health and safety, and to otherwise preserve and protect the Collateral from harm, erosion, deterioration, theft and vandalism," (4) to demand, collect, and receive rents, (5) to execute and prepare documents and perform any and all acts "necessary to fulfilling the Receiver's duties, including preserving, protecting, managing and controlling the Collateral," (6) to negotiate with government agencies and adjoining landowners, and to the extent deemed necessary or advisable, complete construction of improvements on the project, (7) to do all things necessary and appropriate to ensure timely compliance with the Project's ownership and development obligations, and (8) to assume the Borrower's rights and responsibilities under any easements, developments, construction, lease, or other agreements relating to the Project to the extent the receiver deems it necessary to do so.

The appointment order allowed Wells Fargo to make advances to Hunt for expenses incurred during the performance of his duties. The order expressly stated that "[a]ll advances so made by [Wells Fargo] to the Receiver shall constitute secured advances" and would have the same lien priority as the initial loan advance secured by the deed of trust in 2007. The appointment order also authorized the receiver to issue receiver certificates that would have the same lien priority as the initial loan advance secured by the deed of trust. The appointment order did not contain language requiring the receiver obtain court approval before recording receiver certificates.

7

**Subsequent Court Orders**

On November 3, 2009, the trial court issued a clarifying order specifying "advances by [Wells Fargo] to the receiver to protect the [Project] shall have a lien priority on par with [Wells Fargo's] existing deed of trust" and maintaining the appointment order without modification.

On May 6, 2010, Hunt filed an ex parte application requesting confirmation he had authority to execute a lease agreement with Nokia. Hunt also asserted he had negotiated a modification to the amended and restated disposition and development owner participation agreement (ARDDOPA) and related documents in order to resolve issues with entitlements. Hunt's request was granted on May 6, 2010.

Additionally, Hunt moved ex parte for a confirmation he could execute and perform obligations under a settlement agreement reached with Target Corporation and Red Tail LLC.[7] He also filed an ex parte application to confirm his authority to execute certain agreements to be recorded with Santa Clara County. The court granted Hunt's ex parte applications in June 2010.

**Hunt's Motion for Order to Sell Property "Free and Clear of Liens"**

On September 9, 2010, Hunt filed a motion requesting that the court grant him authority to sell the Project "free and clear of liens and encumbrances." Hunt sought court approval to obtain a broker, to seek and negotiate offers, and have proposed final sales contracts approved by the court through an expedited application process. No opposition was filed.

The following month, the trial court granted the motion and gave Hunt the authority to broker a deal to sell the Project subject to court approval.

---

[7] Target and Red Tail had filed a lawsuit seeking compensation for construction improvements they had completed.

8

3. *The Answer and Cross-complaint*

On May 16, 2011, Downtown Sunnyvale filed an answer to Wells Fargo's September 2009 complaint for specific performance and judicial foreclosure, denying each of the allegations and raising affirmative defenses. That same day, Pau sent a *Wozab*[8] warning letter to Wells Fargo, purportedly on behalf of himself and the Borrowers.[9]

Downtown Sunnyvale also filed a cross-complaint against Wells Fargo, alleging Wells Fargo had violated section 726.[10] The cross-complaint further alleged RREEF and Wells Fargo purportedly entered a secret and collusive agreement whereby Wells Fargo agreed to accept a $16 to $18 million settlement from DSMU to relieve RREEF from the guaranty of the $108.8 million loan. The cross-complaint asserted Hunt did not act fairly toward bidders during the sale, and Hunt refused to consider SHP's competitively-priced bids to purchase the property. Wells Fargo filed a special motion to strike the cross-complaint pursuant to California's anti-SLAPP[11] statute (§ 425.16). The trial court granted Wells Fargo's anti-SLAPP motion, and the Borrowers and SHP appealed. On October 17, 2013, we affirmed the trial court's order in an unpublished opinion. (*Downtown Sunnyvale Residential, LLC v. Wachovia Bank National Association* (Oct. 17, 2013, H037419) [nonpub. opn.].)

On May 18, 2011, Downtown Sunnyvale filed an application to modify the instructions to the receiver regarding the sale of the Project. The application sought an

---

[8] *Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991.

[9] There is some dispute below as to whether Pau was in control of the Borrowers.

[10] On May 27, 2011, an amended cross-complaint was filed, containing largely the same allegations. Seven months later, the parties filed a second amended cross-complaint, with the same allegations.

[11] "SLAPP" stands for " 'strategic lawsuits against public participation.' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 85.)

9

order from the court instructing Hunt to stop his efforts to sell the Project and informing Hunt he did not have and could not be granted the authority to sell under California law.

A week later, Hunt filed a motion requesting the court approve a proposed sale, which Downtown Sunnyvale opposed. Hunt's motion asserted he had entered into a purchase contract for the Project with several entities. The purchase price was below the amount of outstanding debt owed to Wells Fargo.

On June 15, 2011, the trial court granted Downtown Sunnyvale's motion to modify instructions to the receiver and denied Hunt's motion to confirm the sale of the Project without prejudice. The order concluded that "[p]ending a settlement agreement, final judgment or foreclosure decree, the October 12, 2010 order granting receiver the authority to sell the receivership property, etc. is premature."

In August 2011, the Project was sold at a nonjudicial foreclosure sale. Wells Fargo (the sole bidder) placed a credit bid of $108.8 million, the principal amount of the construction loan. The Project was turned over to Wells Fargo on October 4, 2011.

4. *Discharge of the Receiver*

**Hunt's Final Account and Request for Discharge**

On November 4, 2011, Hunt filed a notice of his final account and requested approval of his fees, exoneration of bonds, and discharge of all claims against him and the receivership estate. Hunt asserted that during the course of the receivership, Wells Fargo had advanced approximately $80,219,000 to "stabilize, secure, protect and weatherize the Project, to resolve and pay mechanic's liens, to resolve lawsuits and other claims, to secure, capitalize and deliver a valuable lease with Nokia, Inc., to obtain regulatory closure for certain areas within the Project and obtain approvals to ensure the proper future remediation and monitoring of the toxic contamination for the remaining affected areas, and thereby reasonably quantify the costs to fully address the contamination issue, to obtain adequate insurance coverage for Project improvements and

10

constituents, and to negotiate and re-establish the entitlements for the Project . . . under the specific authority of this Court's October 5, 2009 [appointment order]."

Although no rents were payable during the receivership, Hunt asserted he had identified, pursued, and collected funds derived from the Project from various third parties, including negotiated refunds and reimbursements.

Hunt claimed he had given RREEF and the Borrowers documentation regarding the receivership's expenditures and had provided Pau with the same documents after Pau purported to act on behalf of the Borrowers. These documents included invoices from Hunt, invoices from Hunt's counsel, financial records regarding the resolution of mechanics' liens, costs associated with the Nokia lease, property tax records, records reflecting cost of environmental remediation, and bills for landscaping, security, Pacific Gas and Electric, and water. Hunt admitted in a deposition that although he prepared internal monthly accounting reports, he did not give these reports to the parties. However, he submitted periodic reports detailing the receivership's finances to Wells Fargo when the receivership needed funds.

**The Discovery Process**

In November 2011, Downtown Sunnyvale sent a letter to Hunt's counsel requesting discovery regarding the final accounting. Downtown Sunnyvale also sent a letter brief to the discovery referee, who issued an order granting some of the requests. Later, Hunt claimed these discovery requests amounted to more than 20,000 documents or 100,000 pages worth of material covering the receivership's activities. Hunt and his authorized representative were deposed for a total of seven days.

Hunt filed a motion to disqualify Downtown Sunnyvale's counsel, which the trial court granted in March 2012 after concluding attorneys at the firm Downtown Sunnyvale employed had been "personally involved in providing legal advice and services to the receiver."

11

**The Interim Funding Order and Objections to Hunt's Discharge**

In March 2012, Downtown Sunnyvale filed a letter brief insisting it had the legal right to request an evidentiary hearing on Hunt's final account. The letter argued there were numerous factual disputes regarding the accounting, including: (1) whether Wells Fargo "converted a rents and profits Receiver with a minimal bond into a functional general equity Receiver to act on behalf of the borrower entities and to actually sell the property through the Receiver sale process," (2) whether Hunt's actions chilled the bidding process for the property, (3) whether Hunt colluded with Wells Fargo and RREEF to deny SHP and Pau equitable rights to the Property and purposefully ignored Pau's bids to purchase the Property, (4) whether Hunt overencumbered the Project when he accumulated over $85 million in receiver's certificates and liens, (5) whether Hunt improperly and in excess of his authority spent money to settle junior liens, (6) whether Hunt improperly spent money and time in pursuing a receiver's sale, and (7) whether Hunt "exceeded his authority in negotiating and entering into [a] myriad of agreements" as set forth in his final accounting.

The following month, Hunt sought ex parte for a briefing schedule to address funding the receivership estate. He also requested approval to employ special counsel. In an accompanying declaration, Hunt's attorney claimed the funds in the receivership estate had been exhausted and Hunt had run out of money to pay for fees, vendors, consultants, attorneys, and other items necessary for him to perform his duties under the court's appointment order. The court permitted Downtown Sunnyvale to submit authorities on the matter, and Downtown Sunnyvale maintained Wells Fargo was obligated to pay the costs of the receivership.

In April 2012, the court held a hearing and stated it believed "to the extent that there's an order regarding payment to the receiver, it should be the obligation of the party that requested [the appointment of the receiver] in the first place up until the point of the

discharge." At one point during the hearing, the court acknowledged Wells Fargo's argument that the court retained the discretion to charge any party to the litigation with the receiver's costs. However, the court reiterated that its inclination was that Wells Fargo ought to pay the receiver's expenses.

On April 20, 2012, the trial court entered an order approving the receiver's request to employ special counsel and specifying Wells Fargo was to pay the receivership costs through the date of discharge. The order noted the receivership was established pursuant to Wells Fargo's request and the "continued necessity for the receivership was abrogated by [Wells Fargo's] decision to proceed with non-judicial foreclosure rather than pursue its claim for judicial foreclosure."

**The Discharge Order**

In May 2012, Downtown Sunnyvale formally objected to Hunt's final account.[12] The same month, the trial court accepted Hunt's final account and discharged him, overruling Downtown Sunnyvale's objections. The court rejected Downtown Sunnyvale's argument that Hunt was limited to protecting and preserving the property.

The trial court noted that Downtown Sunnyvale "question[s] the propriety of the broad power given to the receiver pursuant to the Appointment Order and subsequent orders, but the court's role in this instant motion is not to question or reconsider the propriety of these prior orders. The court's function now is limited to determining

---

[12] The allegations included: (1) Hunt had violated his duties as a receiver when he sought to sell the property pursuant to the receiver's sale, (2) Hunt did not follow the appointment order by limiting his role to that of a "rents and profits" receiver and improperly pursued development of the Property in collusion with Wells Fargo, (3) Hunt violated California Rules of Court, rule 3.1182(a) and the appointment order by failing to serve the parties monthly reports, (4) Hunt violated his duty to act as an independent and neutral receiver because his allegiance was to Wells Fargo, (5) Hunt nearly doubled the debt burden on the Property by spending approximately $89 million in pursuing development, (6) Hunt chilled the bidding on the foreclosure sale, and (7) Hunt's fees (in excess of $1 million) were unreasonable and excessive.

13

whether the receiver acted within the scope of the Appointment Order and subsequent order. In view of the express authority granted to the receiver by the Appointment Order and subsequent orders, the court finds the receiver did not act outside the scope of his given authority."

Additionally, Downtown Sunnyvale had alleged Hunt failed to properly carry out his duties because he did not submit monthly reports and failed to act neutrally in his role as a receiver. The trial court rejected these claims, concluding Downtown Sunnyvale did not show it had been prejudiced by Hunt's failure to file monthly reports and had not adequately shown Hunt chilled bidding during the sale process.

Subsequently, the court approved Hunt's fees and ordered Wells Fargo to pay the remaining unpaid costs of the receivership through the entry of the order.

**The Motion to Reconsider and Application for Postdischarge Fees and Costs**

On June 18, 2012, Downtown Sunnyvale filed a motion to reconsider the discharge order, which the court deemed untimely.

Thereafter, Hunt filed a fee application with the court, itemizing his postdischarge fees, with the bulk of the fees attributed to Downtown Sunnyvale's legal actions. Hunt also asserted he had incurred approximately $72,346.64 in performing other necessary postdischarge tasks such as preparing his final accounting, reviewing and analyzing the discharge order, and responding to press inquiries. Hunt recommended the trial court exercise its discretion and apportion $144,890.88 of the fees and costs to Downtown Sunnyvale and $36,173.32 of the fees and costs to Wells Fargo.

On October 11, 2012, the trial court entered an order on Hunt's postdischarge fees and costs. The trial court acknowledged its discretion to apportion fees to different parties in the litigation but concluded Wells Fargo was the primary beneficiary of the receivership estate and should bear the burden of the receiver's costs. The court further

14

determined that some of Hunt's costs were not reasonable and reduced his fees by 20 percent.  Wells Fargo appealed the postdischarge order.

**DISCUSSION**

**I.  Downtown Sunnyvale's Appeal**

Downtown Sunnyvale argues the court erred in discharging Hunt and terminating the receivership, because proper interpretation of the appointment order under California law and the provisions of the deed of trust meant Hunt was granted only limited powers as a rents and profits receiver.  For the reasons set forth below, we disagree with Downtown Sunnyvale's characterization of the receivership and affirm the discharge order.

1.  *Failure to Appeal from the Appointment Order*

First, we address the threshold issue of appealability.  Hunt asserts Downtown Sunnyvale's objections to the scope of the appointment order are not cognizable on this appeal from the discharge order, because Downtown Sunnyvale did not appeal from the appointment order, which was appealable under section 904.1, subdivision (a)(7).  (See *Pacific Broadcasting Co. v. Superior Court* (1929) 100 Cal.App. 649, 651.)

It is well-settled that "if an order is appealable, appeal must be taken or the right to appellate review is forfeited."  (*In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 761, fn. 8.)  California law mandates that if an appeal is taken pursuant to sections 904.1 or 904.2, a reviewing court may consider any intermediate ruling, proceeding, order, or decision implicating the merits or affecting the judgment or order that is appealed.  (§ 906.)  However, a reviewing court is not authorized to review an order or decision from which an appeal might have been taken.  (*Ibid*.)  Therefore, on appeal from the trial court's order *discharging* Hunt as a receiver, we may not review the trial court's order *appointing* Hunt as the receiver.

15

Downtown Sunnyvale maintains it is not appealing the appointment order, but the discharge order. We agree to the extent Downtown Sunnyvale's argument here on appeal is that the trial court's discharge order improperly interpreted the scope of Hunt's authority under the appointment order and the court's subsequent orders. While this seems like an order attacking the validity of the appointment order, it is not--it is a challenge to the trial court's interpretation of the law when it discharged Hunt.

However, some of Downtown Sunnyvale's contentions appear to be collateral attacks on the appointment order. We will not review these claims. If the appointment order granted Hunt authority to develop and improve the Project, Downtown Sunnyvale has forfeited its assertion that this grant of power was made in error. (*Rios v. Allstate Ins. Co.* (1977) 68 Cal.App.3d 811, 818 ["A collateral attack is one to prevent enforcement of a judgment or to defeat rights acquired under it."].)

Accordingly, we confine ourselves to reviewing whether the court erred in discharging Hunt based on an erroneous interpretation of the appointment order, and if the court abused its discretion in concluding Hunt did not breach his fiduciary duties.

2. *Statutory Framework and Standard of Review*

Preliminarily, we review the statutory framework regarding receiverships and our applicable standard of review.

"A receiver is a person appointed by a court to take possession of property that is the subject of litigation, to manage and preserve it, and to dispose of it according to the orders of the court." (11 Miller & Starr, Cal. Real Estate (3d ed. 2009) § 33:2, p. 33-5, fns. omitted.) "[S]ection 564 contains a principal source of authority for trial courts to appoint receivers. . . . [¶] The requirements of . . . section 564 are jurisdictional, and without a showing bringing the receiver within one of the subdivisions of that section the court's order appointing a receiver is void." (*Turner v. Superior Court* (1977) 72 Cal.App.3d 804, 811, fn. omitted (*Turner*).) Receivers can be appointed in "all other

16

cases where necessary to preserve the property or rights of any party" (§ 564, subd. (b)(9)), including when a deed of trust specifically contracts for a receiver upon a borrower's default. (*Barclays Bank of California v. Superior Court* (1977) 69 Cal.App.3d 593, 599-600 (*Barclays Bank*).)

Once a court appoints a receiver, "[i]t is the rule that: 'The functions and powers of a receiver are controlled by statute, by the order appointing him, and by orders subsequently made by the court. He has no powers beyond those so conferred.' (42 Cal.Jur. 2d, Receivers, § 73; and see authority there collected.)" (*Morand v. Superior Court* (1974) 38 Cal.App.3d 347, 351 (*Morand*).) "Where a receiver's powers and duties are not directly prescribed by statute, they are dependent upon the court's order of appointment." (*Nulaid Farmers Assn. v. LaTorre* (1967) 252 Cal.App.2d 788, 791.) A receiver's powers " 'may be expanded or contracted by subsequent court order.' " (*Resolution Trust Corp. v. Bayside Developers* (9th Cir. 1994) 43 F.3d 1230, 1242 (*Resolution Trust Corp.*), citing to *Cal-American Income Property Fund VII v. Brown Development Corp.* (1982) 138 Cal.App.3d 268, 273 (*Cal-American*).) However, there are certain limits to the scope of a receiver's powers. For example, a court cannot grant a receiver authority to take possession of property that is not hypothecated in a deed of trust. (*Turner, supra*, 72 Cal.App.3d at p. 816.)

A trial court is awarded great discretion in appointing, administering, and discharging receivers. Therefore, we review the trial court's order discharging Hunt for abuse of discretion. (See *City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 931; *Sly v. Superior Court* (1925) 71 Cal.App. 290, 294; *Macmorris Sales Corp. v. Kozak* (1967) 249 Cal.App.2d 998, 1005.) "An abuse of discretion occurs 'where, considering all the relevant circumstances, the court has exceeded the bounds of reason or it can fairly be said that no judge would reasonably make the same order under the same circumstances.' " (*In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 7.)

17

Downtown Sunnyvale contends we should apply a de novo standard of review to certain issues, including whether the trial court erred in failing to apply section 564 when interpreting its prior receiver orders and whether the trial court erred in failing to apply section 568 and applicable foreclosure laws when evaluating the propriety of Hunt's actions. However, whether we apply a de novo standard of review or an abuse of discretion standard of review is irrelevant in this context; if the trial court failed to apply the applicable law, it would be a clear abuse of discretion. But to the extent our analysis relies on pure questions of law, including statutory interpretation, we apply a de novo standard of review. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799-801.)

3. *Proper Interpretation of the Receiver's Powers*

Downtown Sunnyvale claims the trial court improperly interpreted the scope of the receivership to include powers extending beyond that of a rents and profits receiver and therefore erred when it discharged Hunt. This argument requires us to determine the scope of the receivership estate and Hunt's powers. If, as Downtown Sunnyvale surmises, Hunt was appointed by the court as a limited purpose rents and profits receiver and was not permitted to develop or improve the Project, then the court erred in discharging him.

As we explain below, California law, the relevant portions of the deed of trust, the court's appointment order, and the court's subsequent orders all support the trial court's conclusion that Hunt acted within the scope of his authority during the course of the receivership.

a. **The Receivership Estate**

First, we determine that Hunt was appointed as a receiver over the Project and the Project's collateral, which broadly included all leases, buildings, and contract rights.

The deed of trust provided that in the event of a default, Wells Fargo could apply to the trial court to appoint a receiver "*for all purposes* including, without limitation, to

18

manage and operate the [Project] or any part thereof, and to apply the Rents therefrom as hereinabove provided."  (Italics added.)  The collateral, which Wells Fargo possessed a security interest, was described as including a multitude of items including all buildings and improvements, all fixtures, all building materials, all leases, licenses, or occupancy agreements, and all contract rights.[13]

Indeed, the court's appointment order charged Hunt with taking possession of all of the collateral as described in the loan documents.  Wells Fargo's initial complaint for judicial foreclosure also specifically requested appointment of a receiver "with the usual powers and duties of receivers so appointed, to take possession of the Sunnyvale [Project] and the Sunnyvale Collateral."

Therefore, the Project and the Project's collateral comprised the receivership estate.

### b.  **Hunt's Powers Determined by Court Orders and Statute**

Next, we must examine the scope of Hunt's authority as a receiver.  It is well settled that once the power to appoint a receiver exists and the receiver is appointed, his "functions and powers are controlled by statute, by the order appointing him, and by the court's subsequent orders."  (*Cal-American*, *supra*, 138 Cal.App.3d at p. 273.)  "Where a receiver's powers and duties are not directly prescribed by statute, they are dependent upon the court's order of appointment."  (*Nulaid Farmers Assn. v. LaTorre*, *supra*, 252 Cal.App.2d at p. 791.)

---

[13] Downtown Sunnyvale claims that the deed of trust's provisions limited Wells Fargo's security interest to "the Property, related personal property, and advances necessary to protect the security--not 'all-you-can-eat' servings from the Borrower's equity."  We reject this contention based on the language of the deed of trust.  Contrary to Downtown Sunnyvale's claims, the deed of trust clearly granted Wells Fargo a security interest in additional items including contract rights, leases, and licenses related to the Project.

19

Here, the trial court's orders clearly granted Hunt powers beyond collecting rents and profits and protecting the property. In its appointment order, the trial court granted Hunt "all powers, duties and authorities as are provided by law to take possession of, use, operate, manage and control the Collateral, to collect and receive any and all rents, profits and other income from the Collateral, to protect, preserve, maintain and *improve* the Collateral, and to incur expenses that are necessary and appropriate toward those ends." (Italics added.) The appointment order also granted Hunt the authority to assume the Borrower's rights and responsibilities under any easements, developments, construction, lease, or other agreements relating to the Project to the extent Hunt deemed it necessary to do so. The trial court granted Hunt even more powers in its subsequent order confirming the execution of the lease with Nokia.

Nonetheless, despite the broad grant of authority expressly given to Hunt in the court's orders, Downtown Sunnyvale maintains the court should have interpreted its prior orders as granting Hunt authority limited to preserving and protecting the property as a rents and profits receiver.

First, Downtown Sunnyvale insists the court's November 2009 order clarifying lien priorities properly interpreted the scope of Hunt's authority as limited to protection and preservation. This argument is premised on a line in the court's order stating: "It is the order of the court that advances by [Wells Fargo] to the receiver to protect the [Project] shall have a lien priority on par with [Wells Fargo's] existing deed of trust. The order entered on October 5, 2009 [the appointment order] shall remain in effect without modification."

While the order does reference advances meant to "protect" the property, the order also expressly states that the October 2009 appointment order, gave Hunt authority to manage the Project, would remain in effect without any changes. We therefore reject any claim that the clarifying order somehow limited the earlier appointment order or

20

suggested the appointment order should be interpreted as restricting Hunt's powers to protection.

Additionally, even if the appointment order was not broad enough to grant Hunt certain powers, Hunt sought court approval before undertaking many of his major activities, including executing the lease with Nokia and negotiating settlements with Target and Red Tail. The court ratified these actions by confirming them in its orders granting his ex parte motions. Therefore, there can be no complaint that Hunt committed any unauthorized acts. (See *People v. Riverside University* (1973) 35 Cal.App.3d 572, 581-582.)

However, Downtown Sunnyvale maintains that receivers in foreclosure actions possess limited powers and devotes a section of its opening brief differentiating between various categories of receiverships. For example, Downtown Sunnyvale claims a receiver in a foreclosure action authorized under section 564, subdivision (b)(2), (9), (11) or (12) is only permitted to protect, preserve and maintain the security and to collect any rents and profits, while an equity receiver authorized under section 564, subdivision (b)(6) is only permitted to manage a corporation to satisfy creditors out of the corporation's assets. Therefore, Downtown Sunnyvale insists the trial court should have interpreted the appointment order as granting Hunt powers restricted to protecting, preserving, or maintaining the security, because "[t]he appointing court's jurisdiction pursuant to § 564's secured lender provisions was limited to 'where necessary to preserve the property or rights of any party.' (C.C.P. § 564(b)(9).)"

This interpretation of section 564 lacks merit. Section 564 states that "[a] receiver may be appointed by the court in which an action or proceeding is pending, or by a judge thereof, in the following cases" (§ 564, subd. (b)), including "[i]n all other cases where necessary to preserve the property or rights of any party" (*id.*, subd. (b)(9)). Section 564 does not limit a receiver's authority upon appointment. There is nothing in the statute to

21

suggest if appointment of a receiver is "necessary to preserve the property or rights of any property or rights of any party," a court is thereafter restrained to granting a receiver authority only to preserve and protect.

Furthermore, none of the cases cited by Downtown Sunnyvale lend support to its contention that a court is limited to granting only certain powers to receivers in foreclosure actions. (See *Barclays Bank*, *supra*, 69 Cal.App.3d at p. 600 [holding that because deed of trust provided for appointment of receiver, beneficiary was not required to make a showing that the property was insufficient to discharge mortgage debt prior to appointment]; *Marsch v. Williams* (1994) 23 Cal.App.4th 238, 249 [concluding that an arbitrator was not empowered to appoint a receiver despite agreement of both parties because there is no statutory authorization for such an appointment]; *Turner*, *supra*, 72 Cal.App.3d at p. 816 [holding that a court cannot grant a receiver authority to take into possession property not hypothecated in the deed of trust].)

Importantly, a receiver's powers are not determined based on a broad categorization as a rents and profits receiver or an equity receiver. Courts have acknowledged that a receiver's "functions and powers are controlled by statute, by the order appointing him, and by the court's subsequent orders." (*Cal-American*, *supra*, 138 Cal.App.3d at p. 273.) Accordingly, while there may be such a thing as a "rents and profits receiver" or an "execution receiver," these receivers' powers are not restricted due to a jurisdictional boundary set forth under section 564, but are limited due to a court's appointment and subsequent orders.[14] Furthermore, a receiver's functions and powers, dictated by court order, can be modified since courts retain flexibility to change

---

[14] However, the requirements of section 564 are jurisdictional in the sense that "without a showing bringing the receiver within one of the subdivisions of that section the court's order appointing a receiver is void." (*Turner*, *supra*, 72 Cal.App.3d at p. 811.)

22

instructions or alter previous orders as circumstances require. (See *Lesser & Son v. Seymour* (1950) 35 Cal.2d 494, 499.)

We therefore conclude that under the applicable statutes, the appointment order, and the court's subsequent orders, Hunt was granted broad authority to "take possession of, use, operate, manage and control the Collateral" as well as to "protect, preserve, maintain and *improve* the Collateral." (Italics added.) The language in the court's appointment order and its subsequent orders confirming Hunt's authority does not support Downtown Sunnyvale's narrow interpretation of the receiver's powers.

### c. **Additional Claims**

Additionally, Downtown Sunnyvale raises a myriad of arguments attacking the validity of the discharge order's interpretation of Hunt's powers. We address each of these claims and explain why we reject them.

*Receiver's Actions Barred by Law*

First, Downtown Sunnyvale opines that a receiver is not allowed to take actions barred under the relevant statutes, and we agree. However, we disagree with Downtown Sunnyvale's assertion that the court's interpretation of the appointment order inadvertently granted Hunt powers proscribed under the relevant statutes.

For example, in *Morand*, *supra*, 38 Cal.App.3d 347, an appellate court concluded a receiver who was authorized to take whatever action necessary to obtain property on behalf of a judgment debtor was not allowed to file a claim for declaratory relief against several defendants that were in possession of assets that could be paid to the judgment debtor. (*Id.* at pp. 351-353.) The court noted that under the law, a receiver could only be authorized to commence actions if authorized by statute or by " 'special' " or " 'express' " permission of the appointing court. (*Ibid.*) Because the action was not authorized by statute and the court did not give " 'special' " or " 'express' " permission, the receiver was not permitted to pursue his lawsuit. (*Ibid.*)

23

Unlike *Morand*, the appointment order at issue here did not grant Hunt powers circumventing laws. And, as we previously discussed, section 564 does not act as a jurisdictional limit to a receiver's authority. Furthermore, Hunt's actions to develop or improve the Project were not otherwise prohibited by law.

*Retroactive Expansion of the Deed of Trust*

Downtown Sunnyvale also argues the court's interpretation of the discharge order retroactively expands the scope of the deed of trust. (See *Oxford Street Properties*, *LLC v. Rehabilitation Associates*, *LLC* (2012) 206 Cal.App.4th 296, 308-309.) Downtown Sunnyvale insists the reasonable intent and expectations of the parties, detailed in its communications with the bank and the receiver, was that a receiver would be appointed solely to protect and preserve the property.

However, the express language of the deed of trust contradicts Downtown Sunnyvale's assertions regarding the parties' reasonable expectations. The deed of trust expressly defined the collateral, granting Wells Fargo a security interest in more than the Project's rents and profits. It also set forth that in the event of a default, Wells Fargo could "apply to any court of competent jurisdiction for the appointment of a receiver *for all purposes including*, *without limitation*, to manage and operate the [Project] or any part thereof, and to apply the Rents therefrom as hereinabove provided." (Italics added.) This language demonstrates the parties had consented to a receiver "for all purposes," which included managing the Project.

Given that the parties agreed to a receiver with broad powers in the deed of trust, it is illogical to conclude that Downtown Sunnyvale had a reasonable expectation that an appointed receiver would be a limited-purpose rents and profits receiver. Therefore, the trial court did not impermissibly expand the scope of Hunt's powers and duties as understood by the parties.

24

*Wells Fargo's Complaint for Judicial Foreclosure*

Downtown Sunnyvale also maintains we should interpret the scope of the receiver's powers by looking to Wells Fargo's complaint for judicial foreclosure, which requested a receiver to "facilitate the development, marketing, leasing or maintaining" of the Project. Downtown Sunnyvale asserts this language only contemplates the receiver's facilitation of later development to the Project, not current improvements.

As we previously noted, the express language of the appointment order clearly granted Hunt broad powers to improve the Project. No appeal was taken from the appointment order. Downtown Sunnyvale's failure to appeal from the appointment order has forfeited its argument that the appointment order impermissibly granted Hunt powers beyond that of a rents and profits receiver because that would amount to a collateral attack on an appealable judgment. (§ 906.)

Additionally, we would reject Downtown Sunnyvale's claim that a rents and profits receiver cannot be granted additional powers by a court if we were to consider it on its merits. The proper scope of a receiver's authority has been discussed in several cases including *Resolution Trust Corp.*, *supra*, 43 F.3d 1230, a federal case that applied California law. In *Resolution Trust Corp.*, a trial court appointed a receiver for a townhouse development and authorized the receiver to " 'collect all rents from the subject property, manage said real property and from the rent proceeds protect, conserve and maintain said real property.' " (*Id*. at p. 1242.) The trial court also authorized the receiver to " 'perform all acts to protect and conserve and maintain said real property in the same manner as would the owner protect the property's best interest.' " (*Ibid*.) The Ninth Circuit concluded the trial court's orders created more than a receivership over the rents and profits derived from the property and encompassed the power to sell and carry out pending sales agreements. (*Id*. at pp. 1242-1243.)

In *Turner*, *supra*, 72 Cal.App.3d 804, the trial court appointed a rents and profits receiver upon request of a beneficiary under a deed of trust. (*Id*. at p. 807.) The deed of trust mandated that upon default, the beneficiary could obtain a receiver to " 'enter into possession and hold, occupy, possess and enjoy the property,' " and to " 'take, receive and collect all or any part of the rents, issues, profits, royalties, tolls, earnings, income and installments' " as they became available. (*Id*. at p. 808.) After a hearing, the court appointed a receiver to take possession of the real property and collect rents. The court further authorized the receiver to operate and conduct the business of managing, maintaining and collecting rent, and to "employ labor as may be necessary, purchase supplies and to incur the risk and obligations ordinarily incurred by owners, managers and operators of similar businesses." (*Id*. at p. 809.) Thereafter, pursuant to the receiver's motion, the court authorized the receiver to sell the property subject to confirmation. (*Id*. at p. 810.)

The Court of Appeal in *Turner* reversed the trial court's order authorizing the sale, finding the trial court erred in "purporting to imbue the rents and profits receiver with authority to take into his possession any property . . . which is not hypothecated under the deed of trust without the consent of those entitled to give or withhold consent." (*Turner*, *supra*, 72 Cal.App.3d at p. 816.) Accordingly, the appellate court determined the trial court's order authorizing the sale was beyond the power of the court and concluded it "need not reach or decide the question of the limits upon the rents and profits receiver's authority to sell the receivership estate consisting of the security only under the circumstances of this case." (*Id*. at p. 819.)

In *Cal-American*, *supra*, 138 Cal.App.3d 268, the plaintiff argued the trial court had appointed a " 'rents and profits' " receiver, and that the receiver's powers were expressly limited to the express terms of the appointment order. Therefore, the plaintiff argued that the trial court had erred in confirming the sale of the subject property. (*Id*. at

p. 273.)  The appellate court concluded that although the original stipulation requesting appointment of a receiver did not expressly refer to the receiver's authority to sell property, it did not preclude the possibility of a sale.  (*Id*. at p. 274.)  Additionally, the trial court's order appointing the receiver granted the receiver broad authority to do "such acts respecting the property as the court may authorize." (*Ibid*.)  The court had also retained jurisdiction to allow any of the parties to apply for further orders or modifications of existing orders.  Upon review, the *Cal-American* court determined the trial court had correctly concluded the receiver had the power to sell the property subject to confirmation, but decided the receiver had failed to present sufficient facts warranting exercise of the power to sell.  (*Id*. at pp. 274, 276-277.)

Turner and *Cal-American* exemplify the principle that a receiver's powers are determined by the scope of the appointment order if the receiver's duties are not expressly proscribed by statute.  Additionally, a trial court may grant a receiver authority beyond that prayed for in the original complaint.  *Cal-American* illustrates that even a purported "rents and profits" receiver may still be authorized by the court to sell the property if they are able to demonstrate the need for a sale and are given court approval.  (See *Cal-American*, *supra*, 138 Cal.App.3d at pp. 273-275.)

Therefore, even if we were to accept as true Downtown Sunnyvale's argument that Wells Fargo only prayed for a rents and profits receiver in its original complaint, the trial court would not have erred in granting Hunt additional powers to manage and control the Project and its collateral.

### d.  **Hunt's Actions During the Receivership**

Having determined the court's appointment order and subsequent orders granted Hunt broad authority to manage and develop to the property, we now consider whether the court abused its discretion when it found Hunt acted within the scope of the court's orders when he resolved mechanics' liens and made improvements to the Project.

27

*Resolving Mechanics' Liens*

First, Downtown Sunnyvale claims the court erred in concluding Hunt acted properly, because he impermissibly resolved liens by using the Borrowers' equity and advances that were not allowed under the deed of trust. Downtown Sunnyvale asserts that Hunt "only merged those [mechanics'] liens and [Wells Fargo's] last-priority advances into one gigantic 'Super Lien'–Borrower's Equity." Downtown Sunnyvale emphasizes " '[t]he receiver does not occupy the status of an assignee. His function is that of a minister of the court in possession of the property, *to the end of conserving the rights of everybody having any interest; and no lien or contract is disturbed or altered by the court's intervention.*' " (*Wright v. Standard Engineering Corp.* (1972) 28 Cal.App.3d 244, 248.)

Downtown Sunnyvale's arguments are unsupported. Preliminarily, Downtown Sunnyvale has not articulated how any prior liens or contracts were disturbed or altered by Hunt's activities. Furthermore, the appointment order specifically authorized Hunt to negotiate and resolve mechanics' liens and allowed Hunt to record receiver's certificates. The appointment order permitted Wells Fargo to make advances to the receiver, specifying these advances would be secured advances. There is nothing to suggest that Hunt did anything other than what he was expressly authorized to do under the deed of trust and the court's orders.

*Developments and Improvements to the Project*

Downtown Sunnyvale also argues Hunt's development of the Project exceeded the authority granted to him under the appointment order. As Hunt contends in his respondent's brief, Downtown Sunnyvale has not specifically articulated which of Hunt's actions it believes constitute improper "development work." To the extent Downtown Sunnyvale claims that the improvements made to the Project to fulfill the requirements of

28

the Nokia lease was impermissible, the trial court specifically authorized Hunt to take all necessary steps to execute the Nokia lease.

Moreover, we previously determined the appointment order granted the receiver broad authority to "take possession of, use, operate, manage and control the Collateral" as well as to "protect, preserve, maintain and improve the Collateral." Therefore, there is no support for Downtown Sunnyvale's claim that Hunt's purported development work exceeded the authority granted to him under the court's orders.

Nonetheless, Downtown Sunnyvale asserts that California law has consistently held that a beneficiary has no right to impose the cost of preforeclosure improvements on the borrowers or owners of a property. Therefore, Downtown Sunnyvale insists Hunt had no right to make improvements to the Project. In support of this position, Downtown Sunnyvale cites to *Barry v. OC Residential Properties, LLC* (2011) 194 Cal.App.4th 861. The court in *Barry* stated that "[a]s a general rule 'the mortgagee may make such repairs as are reasonably necessary for the preservation of the property, but not permanent improvements, or things which conduced merely to his comfort or convenience. [Citations.]' [Citation.] ' ". . . Unreasonable improvements may be of benefit to the estate; but, unless made with the consent and approbation of the mortgagor, no allowance can be made for them. The mortgagee has no right to impose them upon the owner, and thereby increase the burden of redeeming." ' " (*Id*. at p. 871.)

*Barry* is inapplicable, it did not concern a receivership--it involved a mortgagee's right to construct improvements and burden the owner upon redemption. In contrast, here we are confronted with a situation where a court-appointed receiver manages and operates a property, making certain improvements based on the authority granted to him by the court itself. Downtown Sunnyvale's contention that *Barry* is analogous lacks support, and it has failed to provide any legal authority for its position that a *receiver* cannot improve or develop a subject property subject to a court's approval.

29

*Violation of Section 726*

Downtown Sunnyvale argues that if the discharge order is affirmed, it must mean the appointment order authorized a violation of section 726 because the receiver's liens depleted the Borrower's equity and in essence was a form of "coercive relief to take the Borrowers' assets--the equivalent of taking funds from a Borrowers' bank account [citation] or creating a 'banker's lien' [citation] before exhausting the security."

Section 726 dictates there can only be one action for the recovery of debt or enforcement of a right secured by a mortgage on a real property or estate. It "is both a 'security-first' and 'one-action' rule: It compels the secured creditor, in a single action, to exhaust his security judicially *before* he may obtain a monetary 'deficiency' judgment against the debtor." (*O'Neil v. General Security Corp.* (1992) 4 Cal.App.4th 587, 597.) A "debtor may raise section 726 as an affirmative defense or may invoke it later as a sanction against a creditor who forecloses without exhausting all of the security in a single action." (*Aplanalp v. Forte* (1990) 225 Cal.App.3d 609, 613.)

Preliminarily, we note that this does not appear to be the correct forum for Downtown Sunnyvale to air its grievances over the purported violation of section 726. Downtown Sunnyvale's claim that Wells Fargo effectively appropriated assets through Hunt by recording receiver liens prior to exhausting its security can be raised in a separate action against Wells Fargo (the secured creditor), or as an affirmative defense in an action brought by the bank.[15]

Hunt was not a creditor; he was a receiver appointed to act as a neutral agent of the court. Wells Fargo, the secured creditor, is not a party to Downtown Sunnyvale's

---

[15] Indeed, Downtown Sunnyvale filed a cross-complaint against Wells Fargo for violating section 726, which was stricken by the trial court under the anti-SLAPP statute (§ 425.16). As we previously discussed, this court affirmed the trial court's order in an unpublished decision. (*Downtown Sunnyvale Residential*, *LLC v*. *Wachovia Bank National Association* (Oct. 17, 2013, H037419) [nonpub. opn.].)

30

appeal over the discharge order. Downtown Sunnyvale has not articulated how its arguments regarding a violation of section 726 are appropriately raised in an appeal following a receiver's discharge.

Furthermore, we are unconvinced that interpreting the appointment order as granting Hunt authority to manage the Project and to make certain improvements would somehow amount to a violation of section 726. *Shin v. Superior Court* (1994) 26 Cal.App.4th 542, which Downtown Sunnyvale relies on in its reply brief, is distinguishable. In *Shin*, a secured lender obtained a prejudgment attachment order against a property in Korea prior to commencing an action for judicial foreclosure. (*Id*. at p. 545.) The *Shin* court concluded this action violated the one action rule. (*Id*. at p. 549.) Unlike *Shin*, here there is no multiplicity of filed lawsuits or actions. Wells Fargo filed a complaint for judicial foreclosure, an action permitted under section 726. The bank also sought appointment of a receiver, which does not constitute an action within the meaning of section 726. (§ 564, subd. (d).)

Moreover, there is nothing in the record to indicate Wells Fargo sought to appropriate noncollateral assets related to the Project in order to satisfy the outstanding debt. (§ 564, subd. (d).) There is also no support for Downtown Sunnyvale's conclusion that Hunt's development of the Project and recording of receiver's liens--acts properly authorized by court order--were in effect a collection of security in violation of the security-first rule. In addition, Downtown Sunnyvale's arguments center on the *receiver's* actions, not on any actions taken by the bank, the secured creditor. There may be some situations where a receiver's actions taken on behalf of a secured creditor may run afoul of section 726, but we are not presented with such a scenario here. (See *In re 500 Ygnacio Associates Ltd*. (Bankr. N.D. Cal. 1992) 141 B.R. 191, 194-195 [receiver applied proceeds taken from rents and profits to pay an indebtedness owed to a secured lender].)

In sum, we find no merit in Downtown Sunnyvale's claims regarding section 726.

### e. **Conclusion**

Given our foregoing analysis of Downtown Sunnyvale's contentions, we conclude the trial court properly interpreted the scope of the order appointing Hunt as the receiver when it discharged him from his duties.

### 4. *Breach of Receiver's Duties*

Next, we turn to Downtown Sunnyvale's contention that the trial court erred in discharging Hunt, because Hunt breached his duty to provide the parties with monthly reports and to act as a neutral agent of the court.

"A receiver is not immune from responsibility for his or her acts. A receiver cannot be held liable as a tortfeasor for an act done within the scope of the powers granted by the order of the court. [Citation.] Nevertheless, a receiver, as any fiduciary, may be surcharged and his or her surety held liable for a failure to properly carry out the duties imposed by the order of appointment." (*Shannon v. Superior Court* (1990) 217 Cal.App.3d 986, 993.)

As we previously noted, the decision to approve a receiver's conduct and discharge him " 'rests upon the sound discretion of the appointing court to be judicially exercised in view of all the surrounding facts and circumstances and in the interest of fairness, justice and rights of the respective parties.' " (*People v. Riverside University*, *supra*, 35 Cal.App.3d at p. 582.) A trial court should approve the receiver's conduct if it is reasonable and undertaken in good faith. (*Ibid*.) "Our view of the facts must be in the light most favorable to the order and we must refrain from exercising our judgment retrospectively. Reversal is warranted only after concluding the trial court abused its discretion by confirming a fraudulent, unfair, or oppressive [act by the receiver]." (*Cal-American*, *supra*, 138 Cal.App.3d at p. 274.)

a. **Failure to File Monthly Reports**

Downtown Sunnyvale maintains that Hunt breached his fiduciary duties when he failed to submit reports and documentation to Pau and SHP.

Pursuant to California Rules of Court, a receiver must provide monthly reports to the parties, and if requested, to nonparty client lienholders. (Cal. Rules of Court, rule 3.1182(a).) The reports must include items such as a narrative report of events, a financial report, and a statement of all fees paid to the receiver, employees, and professionals. (*Ibid*.) Reports are not filed with the court unless the court orders otherwise. (*Id*., subd. (b).)

Therefore, Hunt possessed the duty to provide the parties to the litigation monthly reports of his activities. Hunt admitted in his deposition he prepared monthly reports documenting the finances of the receivership but these reports were not submitted to the parties. However, he claimed during the course of the receivership he prepared and submitted nearly 3,000 pages worth of financial records to Wells Fargo and RREEF as representative of the Borrowers. Downtown Sunnyvale asserts the lack of monthly reporting deprived the parties of important financial information and had they been provided reports on a consistent basis they would have objected earlier to Hunt's actions.

We conclude the court did not abuse its discretion in discharging Hunt despite his failure to provide monthly reports based on its conclusion that Downtown Sunnyvale had not articulated how it was prejudiced by Hunt's actions. The trial court determined Hunt acted within the scope of his granted authority during the course of the receivership. We reasoned this finding was not made in error, because the trial court's appointment order and subsequent orders had granted Hunt broad authority to manage and operate the Project. Additionally, Hunt opined the Borrowers and Wells Fargo were apprised of his actions through the course of the receivership, because they were provided financial

33

documents that explained the receiver's activities.[16]  The receiver also sought court approval for many of his major acts, including execution of the Nokia lease, settlement of claims with Target, and negotiation of changes to the ARDDOPA.  All parties to the litigation were notified of these actions and no requests were made to the receiver for monthly reports.  Based on the foregoing, it was not unreasonable for the trial court to conclude that even though Hunt did not provide monthly reports, the parties were not prejudiced.

Furthermore, Downtown Sunnyvale's claim that "Hunt concealed his required accountings . . . for as long as possible, defying eight . . . court orders for the records" is misleading.  The discovery requests alluded to by Downtown Sunnyvale were not made while the receiver was actively managing the Project.  These requests were made after Hunt filed his final account and moved for discharge.

### b.    Failure to Act as a Neutral Agent

Downtown Sunnyvale also insists that Hunt failed to act as a neutral agent of the court.  Pursuant to California Rules of Court, rule 3.1179, a receiver is a neutral agent that must act for the benefit for all who have an interest in the receivership property.  The party seeking the appointment of a receiver may not enter into any contract or understanding with the receiver concerning what capital expenditures will be made on the property.  (Cal. Rules of Court, rule 3.1179(b)(4).)

Downtown Sunnyvale alleges Hunt improperly favored Wells Fargo's interests, agreed to make capital expenditures as directed by Wells Fargo, used racial slurs against

---

[16] Downtown Sunnyvale has not provided support for its argument that Pau and SHP were also entitled to receive financial documents regarding the receivership. California Rules of Court, rule 3.1182(a) requires a receiver to provide reports to *parties*. Pau and SHP were not the Borrowers, but individual entities that comprise the Borrowers.  Therefore, it is unclear whether Hunt's obligation to provide monthly reports extends to providing monthly reports to SHP and Pau.

Pau, and altered his timesheets in order to conceal his bias. Downtown Sunnyvale claims this bias was widespread, with evidence of the harm it suffered replete in the record. In support, Downtown Sunnyvale points to a portion of Hunt's deposition where he states he treated RREEF, Pau, and SHP differently from Wells Fargo.

Downtown Sunnyvale takes this statement out of context. Reading the full text of the deposition, Hunt actually states that per the court's order, he was independent and neutral, answering only to the court. However, Hunt reiterated he was aware that the lender was providing capital and had the discretion to fund his activities. Accordingly, Hunt insisted he felt it would have been irresponsible for him to independently make decisions "without having some understanding and concurrence of what the bank's willingness was to fund certain activities" he felt were important to protect the collateral.

Hunt's testimony that he "listened" to the bank in order to determine whether Wells Fargo would fund any of the receiver's activities to protect the collateral is not evidence he colluded with Wells Fargo. Hunt stated he merely sought to gain an understanding about what activities Wells Fargo would finance. There is nothing to indicate that Hunt took orders from Wells Fargo, or was otherwise biased in favor of Wells Fargo. Pursuant to the appointment order, Wells Fargo had the discretion to make advances to the receiver for expenses incurred in performing his duties. Hunt's consultations with the bank to determine what actions would be funded can be reasonably perceived as a prudent act in performance of his duties as a receiver. Therefore, it was not unreasonable for the trial court to conclude Hunt did not breach his duty to remain neutral.

5. *Conclusion*

We conclude the trial court properly interpreted the scope of the receivership orders and the receiver's powers under its prior orders. Additionally, we find that Downtown Sunnyvale has failed to adequately demonstrate the court abused its discretion

35

in discharging Hunt despite his alleged breaches of fiduciary duties. We therefore affirm the parts of the discharge order appealed from in case No. H038572.

## II. **Wells Fargo's Appeal**

Wells Fargo appeals from the trial court's order discharging Hunt and the trial court's order requiring Wells Fargo pay the receiver's postdischarge fees. Wells Fargo claims the court improperly allocated all of the fees and costs to the bank solely on the basis that it was the entity that initially sought appointment of the receiver.

### 1. *Appealability*

First, we address the threshold issue of whether the orders are appealable. Downtown Sunnyvale contends Wells Fargo cannot appeal the $1 million advanced to Hunt in October 2011 because that amount was advanced pursuant to the appointment order, which was immediately appealable. Therefore, Downtown Sunnyvale maintains this amount was not "unpaid" when the court entered the discharge order and is not within the provision of the discharge order from which Wells Fargo has appealed.

Wells Fargo insists Downtown Sunnyvale mischaracterizes the nature of the fees imposed, and we agree. Wells Fargo consented to make advances to the receiver pursuant to the appointment order. Therefore, there was approximately $1 million in the receivership estate before Hunt filed his final account. However, this $1 million was not paid to Hunt. The court still had discretion to approve the receiver's fees and determine which party should be obligated to pay. In fact, the discharge order required any cash remaining in the receivership estate after payment of the receiver's fees be returned to Wells Fargo.

Downtown Sunnyvale also argues the interim funding order was appealable; therefore, Wells Fargo's failure to appeal from the funding order means it is barred from pursuing its arguments regarding the predischarge fees. Typically, " 'under the one final judgment rule, interlocutory or interim orders are not appealable, but are only

36

"reviewable on appeal" from the final judgment.' " (*Barton v. Ahmanson Developments, Inc.* (1993) 17 Cal.App.4th 1358, 1360.) Under the collateral order exception, an interim order is appealable if "1. The order is collateral to the subject matter of the litigation, [¶] 2. The order is final as to the collateral matter, and [¶] 3. The order directs the payment of money by the appellant or the performance of an act by or against the appellant." (*Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 297-298.)

The interim funding order directed Wells Fargo to pay money. However, it is clear from the hearing that the trial court did not intend the order to be final. During the hearing, the court remarked that it believed the issues being contested, including the receiver's fees, would be adjudicated at the later discharge hearing. Therefore, no forfeiture has occurred.

2. *Statutory Framework and Standard of Review*

"A receiver is an agent and officer of the court, and is under the control and supervision of the court. (§ 568; Cal. Rules of Court, rule 3.1179.) The receiver is also a fiduciary who must act for the benefit of all parties interested in the property. [Citation.] [¶] Receivers are entitled to compensation for their own services and the services performed by their attorneys. [Citation.] Generally, the costs of a receivership are paid from the property in the receivership estate. [Citations.] However, courts may also impose the receiver costs on a party who sought the appointment of the receiver or ' "apportion them among the parties, depending upon circumstances." ' [Citation.] Courts are vested with broad discretion in determining who is to pay the expenses of a receivership, and the court's determination must be upheld in the absence of a clear showing of an abuse of discretion." (*City of Chula Vista v. Gutierrez* (2012) 207 Cal.App.4th 681, 685-686 (*City of Chula Vista*).) "In considering the appropriate source for the compensation, a relevant factor is whether the party to be charged obtained a benefit from the receiver's services." (*Id.* at p. 686.)

37

"A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.] But the court's discretion is not unlimited . . . . Rather, it must be exercised within the confines of the applicable legal principles. [¶] 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.' [Citations.] 'The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion. [Citation.] . . . [¶] The legal principles that govern the subject of discretionary action vary greatly with context. [Citation.] They are derived from the common law or statutes under which discretion is conferred.' [Citation.] To determine if a court abused its discretion, we must thus consider 'the legal principles and policies that should have guided the court's actions.' " (*Sargon Enterprises*, *Inc*. *v*. *University of Southern California* (2012) 55 Cal.4th 747, 773.)

### 3. *Predischarge Fees*

Wells Fargo argues that the trial court abused its discretion when it ordered all of Hunt's predischarge fees (the fees incurred after the sale of the property and before discharge of the receiver) be paid by the bank.[17] Wells Fargo contends it is clear from the record that the trial court erroneously concluded it did not have the authority to apportion fees to other parties in the litigation. Wells Fargo insists the trial court mistakenly focused its attention on which party sought the receiver's appointment and failed to

---

[17] Wells Fargo does not contest the allocation of receiver fees before the sale of the property and does not contest the amount of the fees.

consider equitable circumstances that would have required other parties to share the burden of the receiver's costs and fees.

The trial court only allowed Downtown Sunnyvale to submit a brief on the fee issue. Therefore, Wells Fargo insists "[Downtown Sunnyvale] used this opportunity to convince the court that (a) the party requesting the receiver is always responsible for the receiver's fees and costs, and (b) the Appointment Order here also made Wells Fargo responsible for all the receivership fees and costs in any event."

Wells Fargo claims neither of these propositions is true, and we agree. "It [is] . . . said that if the [receiver's] fund be insufficient, [the receiver] may then look to the parties at whose instance he was appointed. It may also transpire that liability to pay the expenses and fees of a receivership rests upon any or all of the parties for whose benefit the receivership was created." (*Stanton v. Pratt* (1941) 18 Cal.2d 599, 603.)

Indeed, in *Atlantic Trust Co. v. Chapman* (1908) 208 U.S. 360, the Supreme Court concluded a lower court erred when it held the party who requested the receiver solely responsible for the receiver's fees on the basis that the receivership estate was insufficient to cover the receiver's expenses. (*Id.* at pp. 375-376.) However, in so doing the court did not foreclose the possibility that the party who requested appointment of the receiver may be responsible for the receiver's fees. The court acknowledged that "cases *may* arise in which, because of their special circumstances, it is equitable to require the parties, at whose instance a receiver of the property was appointed, to meet the expenses of the receivership, when the fund in court is ascertained to be insufficient for that purpose." (*Id.* at p. 375.) Therefore, determining which party requested appointment of the receiver is but one factor a court may consider when apportioning fees. It is not dispositive of the issue.

Furthermore, we agree with Wells Fargo's assertion that the appointment order did not mandate that Wells Fargo would be responsible for all fees and costs associated with

the receivership.  The appointment order stated Wells Fargo could make discretionary *advances* to the receiver for expenses incurred in performing receivership duties.  There is nothing in the appointment order requiring Wells Fargo to fund the receivership after the property was sold.

Wells Fargo asserts the trial court mistakenly relied on Downtown Sunnyvale's argument that a receiver's fees should be paid by the party who requested appointment of the receiver.  Therefore, it insists the trial court failed to understand the scope of its discretion.  (*Fletcher v. Superior Court* (2002) 100 Cal.App.4th 386, 392 [" 'ruling otherwise within the trial court's power will nonetheless be set aside where it appears from the record that in issuing the ruling the court failed to exercise the discretion vested in it by law' "].)

If a trial court misunderstands the applicable law, its decision abuses its discretion.  "For example, a court could be mistaken about the scope of its discretion and the mistake could be entirely 'reasonable'--that is, it adopts a position about which reasonable judges could differ.  But a reasoned decision based on the reasonable view of the scope of discretion is still an abuse of judicial discretion when it starts from a mistaken premise, even though nothing about the exercise of discretion is, in ordinary-language use of the phrase, 'beyond the bounds of reason.' " (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393.)

However, "[o]n a silent record, the 'trial court is presumed to have been aware of and followed the applicable law' when exercising its discretion.  [Citations.]  The appellate court cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of its discretion." (*In re Jacob J.* (2005) 130 Cal.App.4th 429, 437-438, disapproved of on another ground in *In re Julian R.* (2009) 47 Cal.4th 487, 494.)

We conclude the record does not affirmatively demonstrate the trial court misunderstood its discretion to apportion costs between the parties. In the beginning of the hearing on the receiver's interim funding, the court asserted it believed the party who requested the receiver should be required to pay the receiver's fees, stating it thought "to the extent that there's an order regarding payment to the receiver, it should be the obligation of the party that requested [the appointment of the receiver] in the first place up until the point of the discharge."

Taken alone, this statement may have supported Wells Fargo's claim. However, it is notable that during the same hearing, the court acknowledged it understood Wells Fargo's arguments that the court *could* charge any party to the litigation for the receiver's fees. At the conclusion of the arguments pertaining to the receiver's funding, the court stated its inclination was that the party who requested the receiver should bear the cost of the receivership. However, the court also noted that it believed "there is some argument to be made that the ongoing work will ultimately benefit the ongoing progress of the [P]roject," and reiterated that it would like to give the fee issue "further thought" and would prefer to "reflect on" the parties' arguments before issuing its order.

Furthermore, the language in the interim funding does not demonstrate the court misunderstood the scope of its discretion. The interim funding order states that "[a]lthough plaintiff [Wells Fargo] has prevailed on its special motion to strike, the receivership was established, in the first instance, at plaintiff's request. Moreover, the continued necessity for the receivership was abrogated by plaintiff's decision to proceed with non-judicial foreclosure rather than pursue its claim for judicial foreclosure." This order expressly acknowledges the existence of equitable factors that may weigh against apportioning the fees to Wells Fargo and suggests the court nonetheless decided to exercise its discretion to impose the receiver's fees on the bank.

41

Finding that the court was aware of its discretion to apportion fees, we turn to Wells Fargo's claim that the court's decision was erroneous because the Borrowers' conduct made the receivership necessary, and Downtown Sunnyvale's meritless objections to the discharge necessitated the receiver's postturnover, predischarge fees.

As discussed in *City of Chula Vista*, *supra*, 207 Cal.App.4th 681, a trial court may require one or more parties to pay the receiver's fees. A relevant factor to be considered is whether the party to be charged received a benefit from the receivership. (*Id*. at p. 686.) Wells Fargo cites to *Luchs v. Ormsby* (1959) 171 Cal.App.2d 377, where the court noted "the assessment imposed on the party whose conduct made the appointment of a receiver necessary is proper." (*Id*. at p. 389.) Additionally, courts have concluded in certain cases that " 'the parties at whose instance [the receivers] were put upon the property should be required to provide the means of payment' " if the receivership estate is insufficient to compensate the receiver for fees and costs. (*Ephraim v. Pacific Bank* (1900) 129 Cal. 589, 594.)

We conclude the trial court did not abuse its discretion in ordering the bank pay all of Hunt's fees. Certainly, Wells Fargo did not create the conditions that necessitated the receiver's appointment, as it was the Borrowers who defaulted on the loan. However, Wells Fargo sought the receiver's appointment and benefitted from the receiver's services during the course of the receivership. In his capacity as a receiver, Hunt protected and weatherized the property, resolved mechanics' liens, settled lawsuits, and executed the lease with Nokia. The collateral on Wells Fargo's loan was protected from additional waste. Undoubtedly, there were equitable factors weighing in favor of charging Wells Fargo with the receiver's fees and costs.

Wells Fargo appears to find fault with the trial court's decision because it failed to address the litigation tactics employed by Downtown Sunnyvale, which the bank characterizes as deceitful and wasteful. However, our review of a trial court's orders is

42

fundamentally premised on the presumption that the order is correct, and error must be affirmatively shown.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

Furthermore, "[e]ach case of this kind must, of necessity, rest upon its own facts." (*Baldwin v. Baldwin* (1947) 82 Cal.App.2d 851, 856.)  It was therefore the responsibility of the trial court to ascertain, based on the circumstances of the case, whether equity would support imposing Hunt's fees on other parties to the litigation.  Courts are vested with broad discretion in determining who is to pay the expenses of a receivership, and the court's determination must be upheld in the absence of a clear showing of an abuse of discretion.  (*City of Chula Vista*, *supra*, 207 Cal.App.4th at pp. 685-686.)  Since it does not appear the court relied on impermissible factors when considering who should bear the receiver's costs, the decision was not unreasonable and was based on the applicable legal principles.

We decline to express an opinion on whether Downtown Sunnyvale's actions caused the receiver's fees to become excessive and whether we agree with Wells Fargo's depiction of Downtown Sunnyvale's litigation tactics.  As we previously noted, some courts have acknowledged it can be fair to apportion receiver's fees to parties whose actions necessitated the receivership.  However, simply because we may not have found it unreasonable if the receiver's fees had been apportioned differently does not mean the court abused its discretion under these particular facts.  "We could . . . disagree with the trial court's conclusion, but if the trial court's conclusion was a reasonable exercise of its discretion, we are not free to substitute our discretion for that of the trial court."  (*Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 881-882.)

4.  *Postdischarge Fees*

Next, Wells Fargo challenges the trial court's postdischarge order requiring it pay all of Hunt's postdischarge fees.  In contrast to its appeal over Hunt's predischarge fees, Wells Fargo does not contend the court failed to understand the scope of its discretion.

43

Instead, Wells Fargo argues the court abused its discretion because some of the fees should have been apportioned to Downtown Sunnyvale, because Hunt's attorney fees were the direct result of the parties' extensive litigation after the receiver's discharge.

The trial court's order directing Wells Fargo pay Hunt's postdischarge fees concluded that in its opinion, Wells Fargo was the primary beneficiary of the receivership estate. It also concluded that not all of the postdischarge fees were reasonable and reduced the fees by 20 percent.

Wells Fargo contends this decision is patently unreasonable because Downtown Sunnyvale's actions alone necessitated nearly all of Hunt's postdischarge fees. Wells Fargo points to several items in Hunt's postdischarge expenses that it argues "most clearly illustrate the unreasonableness of the trial court's allocation" of fees. For example, Wells Fargo argues the fees and costs incurred by Hunt in responding to the procedurally barred motion for reconsideration should not be allocated to Wells Fargo. Additionally, Wells Fargo insists the fees Hunt incurred responding to Downtown Sunnyvale's accusations regarding Pau's civil rights is equally as unreasonable, because the objections were overruled and Hunt was discharged from liability.

Like our decision regarding the predischarge fees, we conclude Wells Fargo has not adequately demonstrated the court abused its discretion in ordering the bank pay Hunt's postdischarge fees. As we discussed above, there were equitable factors weighing in favor of apportioning the fees to the bank, such as Wells Fargo's derived benefit from the receiver's actions and Wells Fargo's role as the party who initially sought the receiver's appointment.

Wells Fargo argues this analysis is flawed, because after the receiver's discharge there was no receivership estate from which it could benefit. However, as we previously noted, "[i]n considering the appropriate source for the [receiver's] compensation, a relevant factor is whether the party to be charged *obtained a benefit from the receiver's*

44

*services*." (*City of Chula Vista*, *supra*, 207 Cal.App.4th at p. 686, italics added.) Undoubtedly, although Wells Fargo may not have directly benefited from the receiver's postdischarge activities, Wells Fargo benefitted from the totality of the receiver's services during the course of the receivership.

Essentially, Wells Fargo urges us to reweigh the discretionary factors a trial court may consider when apportioning a receiver's fees between the parties in a litigation. Its argument is that the factors in favor of apportioning some of the costs to Downtown Sunnyvale ought to be balanced in such a way as to require the court to order Downtown Sunnyvale pay some of the fees. However, this argument stops short of demonstrating the trial court's decision was a clear abuse of discretion " 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon Enterprises*, *Inc*. *v*. *University of Southern California*, *supra*, 55 Cal.4th at p. 773.)

Accordingly, we affirm the court's postdischarge order.

## DISPOSITION

The orders appealed from in case Nos. H038572 and H039024 are affirmed.

In case No. H038572, L. Gerald Hunt is entitled to his costs on appeal.

In case No. H039024, Downtown Sunnyvale is entitled to its costs on appeal.

_____
Premo, Acting P.J.

WE CONCUR:


_____
Elia, J.




_____
Márquez, J.